Original
No. 92-012

PETITION OF RUEDIGER GRIMM, PH.D.
(New Hampshire Board of Examiners of Psychologists)

December 17, 1993

*Linda E. Fraas*, of Concord, on the brief and orally, for the complainant.

*Sulloway & Hollis*, of Concord (*Margaret H. Nelson* and *Sean M. Dunne* on the brief, and *Ms. Nelson* orally), for Ruediger Grimm, Ph.D.

HORTON, J. Ruediger H. Grimm, Ph.D., brings this petition for writ of certiorari seeking to vacate a decision of the New Hampshire Board of Examiners of Psychologists (board) revoking his psychologist certificate. The board's decision was based on findings that Dr. Grimm violated the American Psychological Association Ethical Principles, and thereby acted unprofessionally within the meaning of RSA 330-A:14, II(d), by engaging in sexual relations with the complainant. Dr. Grimm argues that: (1) the board violated his due process rights because not all the hearing panel members were present for all the parties' testimony; (2) the board's decision is unsupported by the record; (3) the full board did not participate in the hearings in violation of RSA 330-A:15; (4) the board's application of the "preponderance of the evidence" standard violated the due process and equal protection guarantees of the New Hampshire Constitution; (5) the board members were biased; (6) the board relied on data not made part of the record; and (7) the board's evidentiary rulings were improper. We vacate and remand.

From September 1984 through January 5, 1988, the complainant visited Dr. Grimm, a certified psychologist in New Hampshire, for weekly psychotherapy sessions. In March 1990, she filed a letter of complaint with the board which alleged that she and Dr. Grimm had engaged in sexual contact beginning in July 1985, and that they had intercourse on December 9, 1986, November 24, 1987, and October 24, 1989. Dr. Grimm denied all the allegations set forth in the complaint.

After reviewing the complaint, the board appointed Sybille Carlson, Ph.D., to investigate and report on the allegations. Dr. Carlson submitted her report to the board in August 1990, and based on her findings, the board initiated disciplinary proceedings against Dr. Grimm.

Upon receipt of the complaint, Dr. Grimm filed a number of motions with the board, including: a motion to strike, or in the alternative, to exclude Dr. Carlson's report; a request for *voir dire* of the board; a request for recusal of board members; a request for a hearing in front of the full board; motions to exclude the testimony of the complainant; and a request to admit the results of a polygraph examination taken by Dr. Grimm. The board granted the doctor's motion to exclude Dr. Carlson's report and her expert testimony, and after discovering that board member Daniel C. Williams, Ph.D. shared office space and expenses with Dr. Carlson, it also recused Dr. Williams. The board rejected Dr. Grimm's argument that the conduct of another board member, Dennis Forgue, who had previously recused

himself because he was the complainant's ex-son-in-law, biased the other panel members. All of Dr. Grimm's other requests were also denied. Finally, the board denied a motion by the complainant to amend her complaint to include new allegations, but it ruled that the evidence of the new allegations would be admitted where relevant to the original charges of sexual contact.

The board held hearings on eight days from December 1990 through February 1991. Five members of the seven-member board participated in the hearings. On September 20, 1991, the board revoked Dr. Grimm's psychologist certificate, finding that Dr. Grimm had violated the American Psychological Association Ethical Principles, and thereby acted unprofessionally within the meaning of RSA 330-A:14, II(d), by engaging in sexual relations with a client.

## I. Due Process Claim

Dr. Grimm argues that the failure of every member of the hearing panel, acting in a fact-finding capacity, to attend all of his and the complainant's testimony violated his right to due process under the State and Federal Constitutions. We agree.

We address Dr. Grimm's State constitutional claim first, *see State v. Ball*, 124 N.H. 226, 231, 471 A.2d 347, 350 (1983), citing federal law only if it aids our analysis. *State v. Maya*, 126 N.H. 590, 594, 493 A.2d 1139, 1143 (1985). Because we find a constitutional violation under this analysis and vacate, we need not analyze his federal constitutional claim.

■ We have held that a "doctor has a legally protected property right in his license to practice medicine and thus is entitled to procedural due process." *Appeal of Plantier*, 126 N.H. 500, 506, 494 A.2d 270, 273 (1985). Likewise, a registered psychologist has a legally protected property interest in his psychologist's certificate. The due process requirements binding administrative procedure are quite different from those binding judicial procedure, *Roy v. Water Supply Comm'n*, 112 N.H. 87, 92, 289 A.2d 650, 654 (1972), and we note that the general rule in administrative proceedings is that an administrative officer "may act on a written record of testimony by witnesses whom he has not personally seen or heard." *Appeal of Seacoast Anti-Pollution League*, 125 N.H. 708, 716, 484 A.2d 1196, 1202 (1984) (quotations omitted).

■ ■ This general rule, however, gives way to an exception where the board elects to make factual determinations as a hearing panel and the record does not provide a reasonable basis for evaluat-

ing the kind of testimony in question. *Id.; see also Opinion of the Justices*, 117 N.H. 390, 393, 373 A.2d 642, 644 (1977). Such is precisely the case where, as here, "the disposition turns on the credibility of the witnesses' testimony. Resolution of the matter boils down to the question of 'who do you believe.'" *Appeal of Plantier*, 126 N.H. at 507, 494 A.2d at 274. According to the board itself, the only direct evidence it received concerning the alleged sexual contact was the testimony of the complainant and Dr. Grimm. The decision and order of the board then rested on its conclusion that the complainant's testimony was more credible than Dr. Grimm's. We hold that, in cases such as this, due process requires all panel members deciding the case to be in attendance for all of the parties' testimony, plus any other testimony on the issue of credibility, in order to effectively assess the issue of credibility. Because the record indicates that this was not the case, we vacate.

There were eight days of hearings conducted by the board over a period of four months. Five members listed their names on the decision to revoke Dr. Grimm's certificate. On the second and third days of the hearings, only four panel members were present for the direct and cross-examination of Dr. Grimm. On the fourth hearing date, only three members were present for the entire day of direct and cross-examination of Dr. Grimm, while a fourth member was present for only a portion of the testimony. On the fifth hearing date, only four members were present for all of the complainant's direct testimony. On the sixth hearing date, two of the panel were present for the full day of the complainant's cross-examination, while a third member was present only in the morning. The fifth member of the panel was not present for any of the parties' testimony although he is cited as participating in the final decision of the board. In sum, the record indicates that only one of the five members was present for all the parties' testimony. Significantly, only two members were present for the entire cross-examination of the complainant. This fact alone demonstrates the effect their absence had on the fact-finding process, given that the purpose of cross-examination is to review testimony given on direct examination "in order to determine the veracity, accuracy and depth of knowledge of the witness." *Petition of Betty Sprague*, 132 N.H. 250, 258, 564 A.2d 829, 834 (1989). Contrary to the complainant's assertion, listening to the tapes of the testimony did not satisfy due process requirements under the circumstances of this case. We recognize that in the course of a long proceeding such as this, panel members may have to leave due to the exigencies of the external world. Upon remand, the board must sus-

pend the proceedings until all the members acting in a fact-finding capacity are physically present to hear the testimony of the parties.

## II. Sufficiency of the Record

■ Dr. Grimm also argues that the board's decision was unsupported by the record and therefore warrants reversal and dismissal. We disagree. Administrative findings of fact are deemed to be *prima facie* lawful and reasonable. RSA 541:13 (1974); *Appeal of Toczko*, 136 N.H. 480, 488, 618 A.2d 800, 805 (1992). In this case, our review of the record reveals that there was sufficient evidence to support the board's conclusion that Dr. Grimm violated the American Psychological Association Ethical Principles, and thereby acted unprofessionally within the meaning of RSA 330-A:14, II(d), by engaging in sexual relations with a client.

## III. Guidance for Remand

Because similar issues may arise upon remand, we will address Dr. Grimm's remaining arguments in the interest of judicial economy. *See Appeal of Plantier*, 126 N.H. at 510, 494 A.2d at 275; *State v. Shannon*, 125 N.H. 653, 661, 484 A.2d 1164, 1171 (1984).

### A. Quorum for Disciplinary Proceedings

■ Dr. Grimm argues that RSA 330-A:15 requires the full board to hear disciplinary complaints. The language upon which Dr. Grimm relies has been eliminated from the statute and therefore we will apply the current version for prospective guidance purposes. *See* Laws 1992, 280:16. RSA 330-A:15-b (Supp. 1992) states: "Any complaint not dismissed or settled informally shall be heard by the board." RSA 330-A:15-b does not specify the number of board members required to lawfully hear disciplinary complaints. Chapter 330-A, however, does contain a quorum requirement: RSA 330-A:7 states that "[f]our members shall constitute a quorum." In determining legislative intent, we look to the language of the entire chapter. *State v. Johnson*, 134 N.H. 570, 576, 595 A.2d 498, 502 (1991). The term "the board" is used consistently throughout chapter 330-A, and if interpreted to mean the "full board" in every instance, this reading would render the quorum requirement of RSA 330-A:7 unnecessary. Accordingly, we hold under the language of RSA 330-A:15-b, that the four member quorum requirement of RSA 330-A:7 modifies the term "the board," and a minimum of four members must constitute a panel to hear disciplinary proceedings. *See Appeal of Net Realty Holding Trust*, 127 N.H. 276, 278, 497 A.2d 865, 866–67 (1985).

## B. Standard of Proof

The legislature has granted the board the authority to adopt procedures for the conduct of hearings consistent with due process. RSA 330-A:8 (Supp. 1992). Pursuant to this authority, the board has applied a preponderance of the evidence burden of proof to disciplinary proceedings. N.H. ADMIN. RULES, Psy. 206.10. Dr. Grimm argues that the board's use of this standard of proof, rather than the higher standard of proof by clear and convincing evidence, violates the due process and equal protection guarantees of the New Hampshire Constitution and the United States Constitution.

■■ Because the United States Constitution provides no greater protection than does our State Constitution under these circumstances, we need not analyze his federal due process claim. *Petition of Bagley*, 128 N.H. 275, 288, 513 A.2d 331, 340 (1986). The State Constitution provides that no person shall be deprived of his life, liberty or property except in accordance with the "law of the land." N.H. CONST. pt. I, art. 15. "[L]aw of the land" means due process of law. *Appeal of Portsmouth Trust Co.*, 120 N.H. 753, 756, 423 A.2d 603, 605 (1980). This court employs a two-part analysis to determine whether particular government procedures satisfy due process. "First it must be determined that the challenged procedures concern a legally protected interest. Second, it must be determined whether the procedures afford the appropriate procedural safeguards." *Id.* (quotations omitted). In assessing whether the challenged procedures afford the appropriate procedural safeguards, we consider the following:

> "(1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail."

*Petition of Bagley*, 128 N.H. at 285, 513 A.2d at 338–39. We hold that application of the preponderance standard survives the *Portsmouth Trust* analysis, as extended and refined by *Bagley*.

■ As we noted above, a psychologist has a legally protected property interest in his psychologist certificate. *See Appeal of Plantier*, 126 N.H. at 506, 494 A.2d at 273. Admittedly, the right to engage in one's profession is a significant private interest. *See id.* at 507, 494

A.2d at 273. The risk of an erroneous deprivation of a doctor's right to practice psychology by use of the preponderance of the evidence standard, though, is minimal. The board can not take any disciplinary action against a psychologist without a hearing. RSA 330-A:15; cf. *Appeal of Portsmouth Trust Co.*, 120 N.H. at 757, 423 A.2d at 605 (discretion in administrative agency to grant a hearing was a factor in due process violation). This fact-finding phase is an adversarial process that grants the psychologist the ability to defend himself. In addition, the board is composed of eight specialists in various fields of mental health treatment and one public health member, assuring that there will always be three members of the hearing panel who share a special expertise in the mental health area. RSA 330-A:3 (Supp. 1992). This minimizes the risk of confusion and misunderstanding about the subject matter of the proceedings. Finally, although the State has a substantial interest in the regulation and supervision of psychologists, as the primary purpose of RSA chapter 330-A is to assure high quality mental health care and to protect the public, the choice of standard would appear to have little more than marginal effect on satisfaction of the State's interest. After weighing the factors set out above, we conclude that the application of the preponderance of the evidence burden of proof to psychologist disciplinary proceedings satisfies due process.

■■ We turn now to Dr. Grimm's argument that applying the lower burden of proof in psychologist disciplinary proceedings violates the equal protection clause of the State and Federal Constitutions. Dr. Grimm's brief did not specifically invoke a provision of the State Constitution; therefore, he has failed to meet his procedural burden of raising a State constitutional claim. *See State v. Fowler*, 132 N.H. 540, 545, 567 A.2d 557, 559–60 (1989); *State v. Dellorfano*, 128 N.H. 628, 633, 517 A.2d 1163, 1166 (1986). Accordingly, we will only address his federal equal protection claim. The thrust of Dr. Grimm's argument is that there is no rational basis for why the standard in psychologist's disciplinary hearings is preponderance, while attorneys enjoy the application of the clear and convincing standard in their disciplinary hearings. This case does not involve a suspect class or fundamental right. The right to work in one's occupation has never been placed on equal footing with fundamental personal rights. *N.H. Podiatric Med. Ass'n v. N.H. Hosp. Ass'n*, 735 F. Supp. 448, 451 (D.N.H. 1990). In the absence of a suspect class or fundamental right, the rational basis test applies, and the classification is presumed to be valid if it "is rationally related to a legitimate state interest." *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S.

432, 440 (1985). We hold that the application of the lesser standard of proof to psychologist disciplinary proceedings is rationally related to a legitimate State interest and does not violate the equal protection clause of the United States Constitution.

 The State is free to treat professions differently according to the needs of the public in relation to each, particularly where, as here, the regulations being compared have been created by separate branches of government. *See Semler v. Board of Dental Examiners*, 294 U.S. 608, 610 (1934); *Eaves v. Board of Medical Examiners*, 467 N.W.2d 234, 237 (Iowa 1991); *In re Polk License Revocation*, 90 N.J. 550, 567–69, 449 A.2d 7, 16 (1982). The New Hampshire Constitution vests discipline of the legal profession in this court, N.H. CONST. pt. II, art. 73-a, whereas the legislative branch regulates psychologists. *See* RSA 330-A:14. In addition, there are marked differences between the substantive practice of each profession and the manner in which they deal with the public. Attorneys and psychologists practice in significantly different fora. The majority of a psychologist's time is spent with individual patients in a private office. Traditionally, there are no third parties present in the office during treatment sessions, and the only records created are the notes of the psychologist. In contrast, virtually every aspect of the practice of law is subject to scrutiny. *See In re Polk License Revocation*, 90 N.J. at 572, 449 A.2d at 18–19. *But see In the Matter of Dr. David Zar*, 434 N.W.2d 598 (S.D. 1989). Due to the nature of the adversarial process, attorneys can hardly avoid leaving a paper trail memorializing conduct. Further, much of an attorney's time is spent in court or in the presence of opposing counsel. Under most circumstances, disciplinary proceedings against attorneys have the benefit of corroborating evidence that may not be present in proceedings such as this where credibility is at issue. A less stringent burden of proof in proceedings involving psychologist certificates is rational when assessing the difficulty of proof.

Dr. Grimm's argument assumes that a higher burden of proof for attorney disciplinary proceedings is irrational and unfair. However, a higher standard of proof for attorneys can be justified by the role they play in a process where there is always a losing party. The losing party may frequently transform his resentment into seeking redress against the attorneys involved; a higher standard of proof may be necessary to weed out frivolous claims. *Cf. Imbler v. Pachtman*, 424 U.S. 409, 425 (1976). We are therefore satisfied that providing a less stringent standard of proof to the disciplinary proceedings of psychologists is not arbitrary or irrational and does not violate the equal protection guarantees of the United States Constitution.

## C. Bias

Dr. Grimm contends that the board members were biased. Specifically, he points to Dr. Carlson's report and the affiliations of the two recused board members in support of his position.

We first examine his argument that because the Carlson report reached a conclusion on the ultimate factual issue, it impermissibly tainted the proceedings against Dr. Grimm. The party alleging that an investigative report biased an administrative proceeding must present a specific foundation "for suspecting that the Board ha[s] been prejudiced by its investigation or would be disabled from hearing and deciding on the basis of the evidence to be presented at the contested hearing." *Withrow v. Larkin,* 421 U.S. 35, 55 (1975). Dr. Grimm failed to offer evidence that established such a foundation. The investigatory report was not admitted into evidence, and the record contained no indication that the board considered the report for any purpose other than to determine whether the allegations brought against Dr. Grimm warranted a disciplinary hearing.

Dr. Grimm further argues that he was entitled to *voir dire* the hearing panel members as to their possible bias or prejudice. There is no decisional, constitutional, or statutory basis for equating the exercise of *voir dire* with a fair administrative hearing. In fact, so far as we have been able to discern, *voir dire* examination is permitted only in the impaneling of a jury to hear a civil or criminal case and then solely as a result of statute or rule. *See* RSA 500-A:12 (1983 & Supp. 1992); *Mendicino v. Whitchurch,* 565 P.2d 460, 471 (Wyo. 1977). We must therefore reject Dr. Grimm's argument that the board's refusal to permit *voir dire* was improper.

Administrative officials who serve in an adjudicatory capacity are presumed to be of conscience and capable of reaching a just and fair result. *Appeal of Maddox,* 133 N.H. 180, 182, 575 A.2d 1, 3 (1990); *see also Appeal of Beyer,* 122 N.H. 934, 941, 453 A.2d 834, 838 (1982); *Withrow,* 421 U.S. at 55. The burden is upon the party alleging bias to present sufficient evidence to rebut this presumption. *Appeal of Maddox,* 133 N.H. at 182, 575 A.2d at 3; *see also Ostrer v. Luther,* 668 F. Supp. 724, 734 (D. Conn. 1987). To disqualify an administrative official, the party should file a motion for recusal supported by a sufficient affidavit of personal bias or other disqualification. *See* R. WIEBUSCH, 5 NEW HAMPSHIRE PRACTICE, CIVIL PRACTICE AND PROCEDURE § 2074, at 512–13 (1984 & Supp. 1992). Thus, a claim of bias must be developed independently of any

interrogation of the board. In this case, our review of the record indicated that Dr. Grimm failed to meet that burden.

### D. *Officially noticed data under RSA 541-A:18*

The doctor also argues that the board erred by relying on data that was not part of the record and that he was not given the opportunity to contest pursuant to RSA 541-A:18 (Supp. 1992). We disagree.

 Under RSA 541-A:18, V(a), an agency may take "official notice" of generally recognized technical or scientific facts within its specialized knowledge. If an agency takes notice of facts, it must give the parties advance notice and the opportunity to contest such facts. RSA 541-A:18, V(b); *see Arthurs v. Board of Registration in Medicine*, 383 Mass. 299, 310, 418 N.E.2d 1236, 1244 (1981). However, an administrative agency need not give the parties notice or the opportunity to rebut when it utilizes its "experience, technical competence and specialized knowledge" in the *evaluation* of evidence. RSA 541-A:18, V(b). The issue before us therefore is whether the controverted portions of the board's decision and order were examples of the board using its expertise to evaluate evidence already in the record, or whether the board was using its expertise as a substitute for evidence in the record. We hold that in each of the examples cited by Dr. Grimm, the board was properly using its expertise to evaluate expert evidence already propounded by Dr. Grimm.

Dr. Grimm calls our attention to two portions of the board's decision and order. First, he points to the board's rejection of his expert's opinion that the complainant's complaint represented "dissociative or fantastical thinking on her part." In rejecting this evidence, the board found: "Dissociation occurs as a means of escaping painful experiences. Given the complainant's undisputed history of childhood sexual abuse, she could not reasonably be considered to have 'imagined' sexual intercourse with Dr. Grimm as a dissociative response to some retraumatization legitimately experienced in the context of Dr. Grimm's therapy." Second, the board rejected the expert testimony Dr. Grimm submitted on pseudomemories created under hypnosis as "interesting but they do not represent accepted principles in the field of psychology." Instead, the board found that "the principal research in this field related to memories that could be retrieved only through hypnosis and are not ordinary memories of activities which occurred during time periods closely associated with periods of hypnosis."

■ At the outset, we note that the board may reject uncontradicted opinion testimony that its own expertise renders unpersuasive. *See Appeal of Lambrou*, 136 N.H. 18, 20, 609 A.2d 754, 755 (1992); *Franz v. Board of Medical Quality Assur.*, 31 Cal. 3d 124, 139–40, 181 Cal. Rptr. 732, 739, 642 P.2d 792, 799 (1982). The record contains a lengthy discussion defining dissociation and when it occurs, and an extensive analysis of the research done on hypnosis and pseudomemories. In its decision and order, the board did not insert these theories into evidence; it used its expertise and technical background to evaluate the theories and decide whether they should be accepted or rejected. Because the board used its own expertise to reject opinion testimony contained in the record, and did not improperly notice evidence that was outside the record, we hold that the board did not violate RSA 541-A:18.

*E. Evidentiary Rulings*

■ The doctor further argues that a number of the board's evidentiary rulings were improper. The general rule is that the rules of evidence do not apply to administrative tribunals, RSA 541-A:18, II; *Appeal of Plantier*, 126 N.H. at 512, 494 A.2d at 276–77; *N.H. Milk Dealers' Ass'n v. Milk Control Board*, 107 N.H. 335, 340, 222 A.2d 194, 199 (1966), though "privileges apply, and irrelevant, immaterial, unreliable, or incompetent evidence is to be excluded." *Appeal of Plantier*, 126 N.H. at 512, 494 A.2d at 277; *see also* RSA 541-A:18, II.

■ Dr. Grimm first challenges the board's admission of the complainant's testimony of events that occurred while she was under hypnosis, arguing that such evidence is unreliable. Dr. Grimm relies upon the United States Supreme Court decision in *Rock v. Arkansas*, 483 U.S. 44, 61 (1987), in which the Court acknowledged the dangers associated with admitting hypnotically refreshed testimony. The Court's decision in *Rock*, however, was based upon a situation where the witness could not remember the details of an event before trial, and the witness was hypnotized to refresh his or her memory. This case differs from the facts in *Rock* because hypnosis was never used to *refresh* the complainant's memory of the alleged sexual contact with Dr. Grimm; instead she testified about events that occurred during sessions with Dr. Grimm in which she was hypnotized. In other words, she independently recalled the events that transpired while she was under hypnosis. Therefore, the board did not err by admitting the complainant's testimony.

■ Dr. Grimm further argues that the board improperly excluded the results of his polygraph examination. We have held that

polygraph examination results are inadmissable in criminal proceedings to prove an accused's guilt or innocence. *State v. French*, 119 N.H. 500, 503, 403 A.2d 424, 426, *cert. denied*, 444 U.S. 954 (1979); *State v. Ober*, 126 N.H. 471, 471–472, 493 A.2d 493, 493 (1985). This rule of inadmissibility is based upon the unreliability of such tests, *Ober*, 126 N.H. at 472, 493 A.2d at 493, and their "dubious scientific value." *deVries v. St. Paul Fire and Marine Insurance Co.*, 716 F.2d 939, 945 (1st Cir. 1989). Other jurisdictions have applied similar logic to exclude the results of polygraph examinations from administrative proceedings. *See Department of Public Safety and Correctional Services v. Scruggs*, 79 Md. App. 312, 556 A.2d 736 (1989); *Salvaglio v. Board of Fire & Police Com'rs*, 125 Ill. App. 3d 391, 465 N.E.2d 1065 (1984). Accordingly, we hold that the board did not abuse its discretion by excluding the results of Dr. Grimm's polygraph examination.

Finally, we turn to Dr. Grimm's argument that the board erred by finding, absent expert evidence, that Dr. Grimm's handling of the complainant's eroticized transference fell below the professional standard of care. We have held with respect to "administrative bodies whose jurisdiction is limited to particular types of cases, the standard of ordinary care is within the competence of the board and, for this reason, expert testimony is not always necessary." *Appeal of Beyer*, 122 N.H. at 940, 453 A.2d at 837. We hold that the board did not need expert testimony to support this determination, particularly in light of the fact that Dr. Grimm was not disciplined upon that particular issue.

We remand the case for a new hearing consistent with this opinion.

*Vacated and remanded.*

All concurred.